# In the United States Court of Federal Claims

No. 09-872 C
(Filed Under Seal: March 5, 2010)
(Reissued for Publication: March 23, 2010)[*]

| | |
|---|---|
| ************************************<br>DATAMILL, INC.,              *<br>                      *<br>        Plaintiff,    *<br>                      *<br>v.                      *<br>                      *<br>THE UNITED STATES,    *<br>                      *<br>        Defendant.   *<br>************************************ | Bid Protest; Subject Matter Jurisdiction;<br>RCFC 12(b)(1); Competition in Contracting<br>Act of 1984, 31 U.S.C. §§ 3551-3556;<br>Federal Acquisition Streamlining Act, 10<br>U.S.C. § 2304c(e); Statutory Interpretation;<br>"In Connection With" the "Issuance" or<br>"Proposed Issuance" of a Delivery Order;<br><u>Global Computer Enterprises, Inc.</u>;<br><u>Distributed Solutions, Inc.</u>; <u>Savantage</u><br><u>Financial Services, Inc.</u> |

<u>Howell Roger Riggs</u>, Huntsville, AL, for plaintiff.

<u>Cameron Cohick</u>, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Before the court in this post-award bid protest are plaintiff's petition for preliminary and permanent injunctive relief; defendant's motion to dismiss for lack of jurisdiction or, in the alternative, motion for judgment upon the administrative record; and plaintiff's motion for judgment upon the administrative record.[1] In this case, plaintiff, an incumbent contractor providing logistics and supply database management support to the Counter Rocket, Artillery Mortar ("C-RAM") Program Office within the United States Army ("Army") Aviation Missile Command, asserts that the Army made an unlawful decision to acquire a system from one of DataMill's competitors without competition. Defendant contends that the court lacks subject matter jurisdiction over protests of delivery orders.[2] For the reasons discussed below,

---

[*] This reissued decision incorporates the redactions proposed by the parties on March 19, 2010. Redactions are indicated with a bracketed ellipsis ("[. . .]").

[1] In a separate, concurrently issued decision, the court adjudicated plaintiff's motion for expedited discovery and defendant's motion to strike.

[2] Alternatively, defendant argues that, even if the court possesses subject matter jurisdiction, it is entitled to judgment on the administrative record because plaintiff cannot satisfy

defendant's motion to dismiss for lack of subject matter jurisdiction is granted.  In light of the court's jurisdictional determination, plaintiff's petition for preliminary and permanent injunctive relief and motion for judgment upon the administrative record are denied as moot.

## I. BACKGROUND[3]

In 2004, the United States Department of Defense ("Defense Department") approved the C-RAM program, a program that became critical to Central Command contingency operations in both Operations Iraqi Freedom and Enduring Freedom in Afghanistan.  AR 126.  The C-RAM program provides "force protection for installations and Forward Operating Bases (FOBs) in current theater operations."  Id. at 207.  DataMill, Inc. ("DataMill"), a Texas corporation, Compl. ¶ 1, licensed to the Army a software program called RepairData, which provided logistics and supply database management support for the C-RAM program, id. ¶ 5; AR 380; see also AR 226 (noting that the license for RepairData was purchased in 2004).  The licensing agreement, which provided for a payment of $40,000.00 annually in support costs to DataMill, Compl. ¶ 5; AR 380, expired on August 31, 2009, AR 126, 385.

Prior to the expiration of its license with DataMill for RepairData, the Army's C-RAM Program Office committed to upgrading its logistics and supply management infrastructure.  Id. at 354.  As part of its upgrade, it considered RepairData, as well as other software and providers, for subsequent use in its supply management and logistics function.  See id. at 448-56.  Several issues were ultimately raised with regard to RepairData's license and the security of data being sent to DataMill.[4]  See id. at 109.  As of May 20, 2009, a decision had apparently been made by personnel within the C-RAM Program Office to replace RepairData.  See id. at 110 (containing a response to Ms. Kennedy's May 20, 2009 electronic mail message, see supra note 4, from Scott C. Dolloff, Chief of Acquisition and Financial Management within the C-RAM Program Office, stating: "Where do we stand on replacing Repair Data?  It sounds like we need to do that immediately").

One alternative that the C-RAM Program Office considered was the Catalog Ordering Logistics Tracking System ("COLTS"), a software program owned by Avantix, LLC ("Avantix"),[5] AR 380; see also id. at 138-41 (explaining the COLTS program), 142 (comparing

---

the requirements for injunctive relief.

[3]  With the exception of the information contained in note 13, infra, the facts are derived from the complaint ("Compl.") and the administrative record ("AR").

[4]  [. . .].

[5]  Avantix "is the developer of COLTS and owns intellectual property rights.  Avantix has exclusively trained and authorized Northrop Grumman . . . [in] Huntsville, AL to provide all COLTS analysis (with the exception of IT solutions) and installation services including all

the COLTS program to RepairData), 448-56 (same).  The COLTS program "provides the tools to manage the Military Supply Chain business process including: configuration management, material order tracking, installation, asset management, maintenance, and weapon system support."  Id. at 138.  The COLTS program had been previously utilized to support other military functions, including the Joint Robotic Repair Facilities worldwide, Joint Service Explosive Ordnance Disposal, the United States Navy ("Navy") Space and Naval Warfare Systems Center ("SPAWAR"), and Army Unmanned Aircraft Systems.  Id.; see also id. at 1-2 (indicating that the Navy Multiband Terminal SATCOM program office purchased a license for the COLTS program in 2002).

Initially, Fred E. Frost, Chief of the Logistics Management Division within the C-RAM Program Office, believed that the COLTS program was "only approved for use by the Navy."[6] Id. at 110.  After comparing the COLTS program to RepairData, the C-RAM Program Office

---

[Automatic Identification Technology] interface solutions."  AR 2.

[6]  In July 2008, the Navy, through SPAWAR, issued Contract N66001-08-D-0024 ("Navy Contract"), an indefinite-delivery/indefinite-quantity ("ID/IQ") contract with a cost-plus-fixed-fee pricing structure under which task and delivery orders could be placed, AR 30, 42, to TASC, Inc. for COLTS software and related services, see id. at 19-107.  The Statement of Work ("SOW") enumerated the scope of the Navy Contract:

> The services set forth [in] this contract shall provide for the support of software and hardware engineering development, implementation, training, Total Life Cycle Systems Management (TLCSM), Reduction in Total Ownership Costs (RTOC), Total Asset Visibility (TAV) of mission critical maintenance and spares, provide maintenance and integrated logistics support (ILS), reduce hard costs, and integrate evolving Automatic Identification Technology (AIT) initiatives, for the Unique Identification (IUID) and Radio Frequency Identification (RFID) for the AIT Insertion project and Configuration Management (CM).

Id. at 72.  The Navy Contract provided for a base year for engineering and technical support services, as well as four one-year option periods for the same services, id. at 20-23, with performance commencing on July 11, 2008, and concluding on July 10, 2013, id. at 8.

A cost-plus-fixed-fee contract is a "cost-reimbursement contract that provides for payment to the contractor of a negotiated fee that is fixed at the inception of the contract.  The fixed fee does not vary with actual cost, but may be adjusted as a result of changes in the work to be performed under the contract."  48 C.F.R. § 16.306 (2009).  Cost-plus-fixed-fee contracts "may take one of two basic forms–completion or term."  Id.  The Navy Contract provided that "[b]oth level of effort (term) and completion type orders may be issued under this contract."  AR 30.  The Navy Contract also set forth procedures for the issuance of delivery and task orders.  Id. at 30-32.

determined that it would save [. . .] annually by utilizing the COLTS program.[7]  Id. at 142; cf. id. at 226 (projecting a savings of [. . .] in fiscal year 2010 using the COLTS program), 456 (projecting an annual overall cost savings of [. . .]).  The C-RAM Program Office also considered that use of RepairData made "[its] data . . . vulnerable to compromise and possible distribution without [its] knowledge since a 3rd party controls the data on an off site commercial server not controlled" by the project manager.  Id. at 450.  By contrast, the C-RAM Program Office determined that use of the COLTS program would permit Northrop Grumman Corp. ("Northrop Grumman"), the prime support contractor for the Army's Aviation and Missile Life Cycle Management Command ("AMCOM"), id. at 280, to host the system on its server and the project manager "would have control over the source and distribution of [its] data," id. at 450.  According to the C-RAM Program Office, "[b]y hosting on the Northrop Grumman server we will have access to our data at all times and historical data will be backed up and available for analysis."  Id. at 451.

By June 3, 2009, the C-RAM Program Office decided to purchase the COLTS program from Avantix.  Id. at 122 ("We are purchasing COLTS . . . ."), 155 (stating that the COLTS program "has barcode/AIT interfaces and tracks and sends data to the [Defense Department] UID registry along with shipment tracking, maintenance, modifications, hardware configuration, inventory management and tracking.  That's what it does and that's what [the C-RAM program] need[s]"); see also id. at 127 (stating that, as of June 4, 2009, the C-RAM Program Office was "developing" an implementation plan for the COLTS program); cf. id. at 226-27 (addressing the need to define an interim method of operations if RepairData was "turned off" on August 31, 2009, and indicating that, as of August 30, 2009, the direction to renew or cancel the RepairData license was still not issued).  In a "Sole Source Justification" document accompanying a June 3, 2009 Independent Government Cost Estimate ("IGCE"), the C-RAM Program Office indicated that the COLTS program

> is required for C-RAM Program Office to manage the fielding and sustainment of the Forward Area Air Defense Command and Control (FAAD C2), Air and Missile Defense Planning Control System (AMDPCS), Air and Missile Defense Airspace Management Cell (ADAM Cell) and the Counter-Rocket, Artillery and Mortar (C-RAM) products.  This software product is uniquely tailored to meet Program Management (PM) requirements for logistics management and has interfaces to Automatic Information Technology (AIT) and the Department of Defense (DOD) Unique Identification (UID) registry database. . . .  The COLTS product can be quickly integrated, cost effective, requires minimal training of the users, and has minimal impact or disruption to current business management processes.

---

[7]  The C-RAM Program Office noted that utilizing RepairData required two databases, whereas the COLTS program required only one.  AR 142; see also id. at 226 (noting that the C-RAM Program Office has two Repairdata license[s]" and that "[o]nly one database is required with COLTS").

Id. at 125.  Mr. Frost stated in a "Statement of Urgency" accompanying the June 3, 2009 IGCE that a "[d]elay of the purchase of the COLTS software product would have a significantly adverse impact on PM C-RAM mission and support requirements."  Id. at 126.

       In order to accomplish its logistics and supply management infrastructure upgrade, the C-RAM Program Office, on August 17, 2009, issued a Military Interdepartmental Purchase Request ("MIPR") to SPAWAR for the COLTS program and related services that were encompassed under the Navy Contract.[8]  Id. at 19-107, 186, 354; supra note 6.  DataMill alleges that the MIPR "did not advise the Navy that a competing system existed or was the incumbent."  Compl. ¶ 9. The SOW accompanying the MIPR indicated that

> [t]his is a performance based service acquisition to provide engineering, technical, and documentation support services to upgrade C-RAM current COTS solutions to COLTS.  The Contractor shall document current software solutions and establish a transition plan to COLTS.  This task includes software purchases, installation of identified C-RAM hardware, interface development of COTS and GOTS software with final approval by the Government customer.  Additionally, the contractor will provide Data Integration and support all logistics requirements for the C-RAM Program Office with a primary location of Huntsville, AL.[9]

AR 189 (footnote added); see also id. at 167-71, 174-78, 181-84 (containing previous drafts of the SOW).  The SOW further indicated that the contractor, among other things, "shall provide technical engineering expertise and recommend innovative system implementation processes." Id. at 189.  The MIPR stated that "[t]his is an Economy Act order placed in accordance with the provisions of 31 USC [§] 1535, DFAS 37-1 and DODI 7220.9M."[10]  Id. at 186, 188.

---

    [8]  Although the MIPR was issued on August 17, 2009, the record indicates that preparations for the issuance of an MIPR for this purpose predated April 10, 2009.  See AR 108.

    [9]  "COTS" refers to a commercially available off-the-shelf item, viz., any item of supply that is (1) a commercial item, (2) sold in substantial quantities in the commercial marketplace, (3) is offered to the government, without modification, in the same form in which it is sold in the commercial marketplace, and (4) does not include bulk cargo.  48 C.F.R. § 2.101.  "GOTS" refers to government off-the-shelf-items, usually software or hardware, that are developed by a particular government agency.

    [10]  The Economy Act provides, in part, that the "head of an agency or major organizational unit within an agency may place an order with a major organizational unit within the same agency or another agency for goods or services" if certain statutory conditions are satisfied.  31 U.S.C. § 1535 (2006).  "DFAS" refers to the "Defense Finance and Accounting Service," and "DODI" refers to "Department of Defense Instruction."  DODI 7220.9-M contains the "Department of Defense Accounting Manual," which was authorized by DODI 7220.9 (Oct. 22, 1981).

The Navy subsequently prepared the issuance of Delivery Order Number 0008 ("Delivery Order No. 0008"), which provided COLTS "in-house support in addition to technical support . . . and new acquisition programs for the Armed Services," id. at 207, under the Navy Contract, id. at 195-201, 355.  On August 24, 2009, Gregory A. Whalin, head of the SPAWAR division that administered the Navy Contract, issued a memorandum entitled "Urgency Impact Statement for Contract Number N66001-08-D-0024, Delivery Order Number 0008" ("Impact Statement").[11] Id. at 207.  The Impact Statement indicated:

> The C-RAM Program Office urgently needs the purchase of COLTS software product prior to 31 Aug[ust 20]09.  Delay of this purchase would adversely impact the PM C-RAM mission an[d] interrupt[] . . . the flow of essential supplies and equipment for shipment, which are critical in support of Operation Iraq Freedom . . . and preparation to deploy to Operation Enduring Freedom . . . in Afghanistan.

> 2.  A delay would negatively impact milestones, deadlines, and decisions from the Sponsor to meet emerging Fleet Operational Readiness requirements for projects and programs.  The level of effort will enable contractor to begin job task, provide support to maintain COLTS, procure all support hardware and software, [and] technical support and provide training to meet major milestones for various Projects (ISEA's), Programs (PEO's) and Sponsors deadlines for Total Asset Visibility (TAV).  Providing services and technical support on the task is a key part of the solution.

> 3.  Funding was received on 17 August 2009, and task services are required as soon as possible.

Id.  Thereafter, SPAWAR drafted a "Mission Critical Action Determination and Funds Availability Check/Approval for SSC PAC," wherein it determined that the MIPR implicated "Mission Critical" requirements, including: (1) supporting an urgent requirement in support of the Global War on Terrorism; (2) addressing a Critical Operational Requirement; (3) preventing a critical work stoppage or safety issue; (4) meeting a critical schedule milestone; and (5) avoiding a gap in contractor services.  Id. at 246; accord id. at 396.

---

[11]  Prior to the issuance of the Impact Statement, Ying Y. Wong, an employee at SPAWAR, contacted Rollie Porter, a member of the Logistics Management Division of the C-RAM Program Office, to request "any information which will assist [its] process with contracts" as the Navy prepared the Impact Statement.  AR 203.  Specifically, Mr. Porter was asked to provide, among other things, "a few words on the critical mission" and an explanation as to why the C-RAM Program Office "require[d] the database to consolidate or replace the current system."  Id.  During oral argument, DataMill opined that this communication suggests that SPAWAR was being "prompted" to provide specific information that would permit the delivery order to "get . . . through the legal offices."  Oral Argument 3:14:28-3:15:27, Feb. 23, 2010.

The SOW for Delivery Order No. 0008, which was signed by Kevin Nguyen, the SPAWAR Contracting Officer's Representative, on September 2, 2009, stated:

> This is a performance based service acquisition to provide (1) software engineering, (2) technical, and (3) documentation support services to upgrade C-RAM current COTS solutions to COLTS.  The Contractor shall document current software solutions and establish a transition plan to COLTS.  This task include[s] software purchases[,] installation of identified C-RAM hardware, [and] interface development of COTS and GOTS software with final approval by the Government customer.  Additionally, the contractor will provide Data Integration and support all logistics requirements for the C-RAM Program Office with a primary location of Huntsville, AL.  This is a completion type task order.

Id. at 241.  Delivery Order No. 0008 purchased "services to upgrade C-RAM current COTS solutions to COLTS" in the amount of $399,989.00,[12] id. at 326, and was signed by William Ashley, the SPAWAR Contracting Officer, on September 18, 2009, id. at 325.  The period of performance for Delivery Order No. 0008 spanned September 18, 2009, through September 17, 2010.[13]  Id. at 329.

On September 2, 2009, an electronic mail communication from Mr. Porter informed recipients that "[t]he PM is making the transition from RepairData to COLTS."  Id. at 445-46.  It also provided instructions for ensuring "a seamless transition."  Id. at 445.  DataMill was mistakenly included as one of the recipients of Mr. Porter's September 2, 2009 electronic mail message.  Id. at 444.  Within fifteen minutes of sending the electronic mail message, Mr. Porter indicated that he was contacted by Tre' Book, the president of DataMill.  Id.  According to Mr. Porter, C-RAM Program Office's RepairData databases "were turned off twenty minutes after that conversation.  No further contact has occurred between me or anyone else in this office with Datamill or Tre Book."  Id.  According to DataMill, it was provided no notice or opportunity "to submit any proposal or quotation to continue to supply the software services needed by the C-RAM Program Office" prior to the September 2, 2009 electronic mail communication it erroneously received.  Id. at 280.  It also maintained that, "[p]rior to the Program Office's determination to non-competitively acquire the COLTS Program, DataMill had received no notice of any deficiency or any request to provide cost for any requested or needed improvement to the RepairData System."  Id. at 281.

---

[12]  DataMill, however, alleges that, prior to the issuance of Delivery Order No. 0008, "C-RAM did not have a 'Current COTS Solution.'"  Compl. ¶ 11.

[13]  On February 23, 2010, defendant filed a supplemental declaration of Mr. Nguyen, which contains information related to the propriety of injunctive relief.  According to Mr. Nguyen, Delivery Order No. 0008 was, as of February 22, 2010, "approximately 98% complete with approximately $10,000 of work to be completed.  The current estimate for completion of this task order is March 5, 2010."  Decl. Kevin Nguyen ¶ 3.

On October 7, 2009, Ms. Kennedy executed a "Determination and Finding Statement to Issue an Order Under the Economy Act" ("D & F Statement"), which stated that "PD-C-RAM proposes to issue an Order under the Economy Act to TASC, Inc. under . . . [SPAWAR] contract N66001-08-D-0024 to provide software engineering services and associated hardware/software to upgrade the C-RAM current COTS logistics management software solution to COLTS."  Id. at 352.  The D & F Statement indicated that "use of an interagency acquisition is in the best interest of the government."  Id.  It also indicated that supplies or services could not be obtained "as conveniently or economically by contracting directly with a private source" and that the "acquisition will appropriately be made under an existing contract of the servicing agency, entered into before placement of the order, to meet the requirements of the servicing agency for the same or similar supplies or services[.]"  Id.

## II.  PROCEDURAL HISTORY

### A.  Proceedings Before the Government Accountability Office ("GAO")

On September 14, 2009, DataMill initiated a protest with the GAO.  Id. at 280-82. DataMill alleged that the C-RAM Program Office's decision to replace RepairData with the COLTS program provided by Avantix and Northrop Grumman, without competition and "without regard to cost," violated the Competition in Contracting Act of 1984 ("CICA"), 31 U.S.C. §§ 3551-3556 (2006).  AR 281.  According to DataMill, "the agency has not made any effort to either evaluate the cost difference in replacing RepairData or provided any mechanism for DataMill to compete."  Id.; see also id. at 381 (stating that DataMill "had no knowledge of the precise manner in which the Army intended to acquire the COLTS software").

DataMill apprised the GAO of a pending lawsuit in the United States District Court for the Northern District of Alabama ("Northern District of Alabama"), wherein DataMill alleged that "Northrop Grumman and/or Avantix had stolen DataMill's proprietary data in violation of the Alabama Trade Secret Act."  Id. at 280.  According to DataMill, its case before the Northern District of Alabama alleged that

> Northrup [sic] Grumman . . . had access to the DataMill RepairData program by virtue of its role as the AMCOM prime support contractor and that Northrup [sic] Grumman TASC provided Avantix (the software developer) with trade secret information enabling Avantix to short cut development time.  Avantix developed a system with the "look and feel" of RepairData.

Id.; see also Compl. ¶¶ 13-14 (reiterating the core allegations in the Northern District of Alabama litigation).  DataMill contended that the C-RAM Program Office was located "as part of the Program Executive Office for Aviation at Redstone Arsenal, Alabama, under the umbrella of AMCOM," thereby rendering the C-RAM Program Office, in the opinion of DataMill, "a co-located tenant at the facility."  AR 380.  This close proximity, DataMill asserted, was important because "C-RAM [Program] Office officials have actual knowledge that AMCOM has several

8

Task Order/Delivery Order contracts that could have accommodated the requirement in this case." Id.  According to DataMill, the C-RAM Program Office opted to utilize the Navy, located in San Diego, California, instead of utilizing the local procurement offices out of "fear that the local procurement offices would have knowledge of the RepairData competing system and require full []and open competition." Id.

DataMill also protested the C-RAM Program Office's decisions (1) "to deceive the Department of the Navy procuring office by failing to provide to the Navy the complete factual circumstances of the existence of a competitor which implicates the integrity of the procurement system, as well as[] the integrity of the Navy," id. at 379, and (2) "to use the Department of Navy SPAWAR . . . Pacific Procuring Agency to obtain the software system from Avantix for fear that the local procurement office would require a full and open competition," id. at 379-80. Recognizing that the Federal Acquisition Streamlining Act of 1994 ("FASA"), Pub. L. No. 103-355, § 1004, 108 Stat. 3243, 3252-53 (codified at 10 U.S.C. § 2304c(e) (2006 & Supp. II 2008) and 41 U.S.C.A. 253j(e) (West 2009)),[14] prevents protests of delivery and task orders under certain circumstances, DataMill framed the issue before the GAO as whether the GAO possessed jurisdiction over "a clear CICA violation notwithstanding the language of FASA."  AR 382.

The GAO ultimately denied DataMill's protest on November 3, 2009.  See id. at 392-94. It explained that, while section 843 of the National Defense Authorization Act for Fiscal Year 2008, Pub. L. 110-181, 122 Stat. 3, 237, permitted protests of task or delivery orders that exceeded $10 million in value, the previous FASA bar on certain protests of task or delivery orders was retained.  AR 393; see also id. (noting that the GAO lacks authority under the FASA to consider protests that do not allege that a task or delivery order increases the scope, period, or maximum value of the contract under which the order was issued).  Rejecting DataMill's position that two United States Court of Federal Claims ("Court of Federal Claims") decisions–Global Computer Enterprises, Inc. v. United States, 88 Fed. Cl. 350 (2009), and Savantage Financial Services, Inc. v. United States, 81 Fed. Cl. 300 (2008)–supported a determination that the GAO possessed jurisdiction to entertain the protest, the GAO reasoned that "DataMill does not protest a modification to a task order or contend that the task order exceeds the scope of the underlying Navy contract.  Instead, DataMill challenges the issuance of the original task order."  AR 394.  Construing DataMill's protest as one "challenging the issuance of a task order that is valued at less than $10 million dollars," the GAO determined that it lacked jurisdiction under the FASA.  Id.

---

[14]  Provisions in the FASA pertaining to ID/IQ contracts are codified identically in titles 10 and 41 of the United States Code, see Group Seven Assocs., LLC v. United States, 68 Fed. Cl. 28, 31 n.5 (2005), the former representing the military procurement equivalents to the latter civilian procurement provisions, see A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 133 n.7 (2006).  Thus, the provisions contained in title 10 of the United States Code apply to the Army.  See 10 U.S.C. § 2303(a)(2).

## B.  Proceedings Before the Court of Federal Claims

On December 17, 2009, DataMill filed its complaint and petition for preliminary and permanent injunctive relief in the Court of Federal Claims.  In its complaint, DataMill alleges that the Army, through the C-RAM Program Office, violated the CICA "by acquiring the COLTS software . . . without competition . . . ."  Compl. ¶ 16(3); see also id. ¶ 15 (protesting the decision by the C-RAM Program Office "to contract for the COLTS software . . . without competition").  Upon the conclusion of briefing on the parties' various motions, the court conducted oral argument on February 23, 2010.

## III.  LEGAL STANDARDS

### A.  Bid Protests

Pursuant to the Tucker Act, the Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1) (2006), and may "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs," id. § 1491(b)(2).  Interested parties are those "prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Am. Fed'n of Gov't Employees, AFL-CIO v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (citing 31 U.S.C. § 3551(2)(A)).

The Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874-76, expanded the bid protest jurisdiction of the Court of Federal Claims.  Pursuant to the ADRA, the Court of Federal Claims reviews the legality of an agency's decision in accordance with the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 (2006).  28 U.S.C. § 1491(b)(4).  Although the APA contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Although "it is well-settled that procurement officials are entitled to broad discretion in the . . . application of procurement regulations," Metcalf Constr. Co. v. United States, 53 Fed. Cl. 617, 622 (2002), the court may set aside a procuring agency's contract "if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure," Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  The protester must show, by a preponderance of the evidence, that either ground justifies a set aside of the contract award.  AmerisourceBergen Drug Corp. v. United States, 60 Fed. Cl. 30, 35 (2004); see also Gulf Group Inc. v. United States, 61 Fed. Cl. 338, 351 (2004) (articulating the preponderance of the evidence standard).  Where "the challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or

regulations.'"  Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1333 (quoting
Kentron Haw., Ltd. v. Warner, 480 F.2d 1166, 1169 (D.C. Cir. 1973)); see also Bannum, Inc. v.
United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (holding that if the procuring agency's
decision was made in violation of the applicable statutes, regulations, or procedures, the court
must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct");
Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (stating that in addition to
showing "a significant error in the procurement process," a protester must show "that the error
prejudiced it").  A protester must satisfy both requirements–significant and prejudicial error–in
order to prevail.[15]  Bannum, Inc., 404 F.3d at 1351.

     "To establish prejudice . . . , a protester must show that there was a 'substantial chance' it
would have received the contract award absent the alleged error."  Banknote Corp. of Am., 365
F.3d at 1350 (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086
(Fed. Cir. 2001)); see also Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996)
("[F]or [a protester] to prevail[,] it must establish not only some significant error in the
procurement process, but also that there was a substantial chance it would have received the
contract award but for that error."); Data Gen. Corp., 78 F.3d at 1562 ("[T]o establish prejudice,
a protester must show that, had it not been for the alleged error in the procurement process, there
was a reasonable likelihood that the protester would have been awarded the contract.").  The
"substantial chance" test creates a "reasonable balance between the importance of (1) averting
unwarranted interruptions of and interferences with the procurement process and (2) ensuring
that protesters who have been adversely affected by allegedly significant error in the procurement
process have a forum available to vent their grievances."  Data Gen. Corp, 78 F.3d at 1563.  A
protester need not show under the "substantial chance" test that "but for the alleged error, [it]
would have been awarded the contract."  Id. at 1562.  Rather, the protester must "demonstrate
more than a 'mere possibility that [it] would have received the contract but for the error [in the
procurement process].'"  Asia Pac. Airlines v. United States, 68 Fed. Cl. 8, 18 (2005) (quoting
Data Gen. Corp., 78 F.3d at 1562); cf. Myers Investigative & Sec. Servs., Inc. v. United States,
275 F.3d, 1366, 1370-71 (Fed. Cir. 2002) (stating that, where a protester claims that the
government was obligated to rebid the contract, as opposed to where the protester claims it
should have been awarded the contract during the original bid protest, the protester "need only
establish that it 'could compete for the contract' if the bid process were made competitive"
(quoting Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1334)).

## B.  Motion to Dismiss for Lack of Jurisdiction

     Defendant challenges the court's jurisdiction over DataMill's complaint.  Whether the
court possesses jurisdiction to decide the merits of a case is a threshold matter.  See Steel Co. v.

---

[15]  "[M]inor errors or irregularities, i.e., harmless errors, committed in the course of the
procurement process are not sufficient grounds to warrant judicial intrusion to upset a
procurement decision."  Metcalf Constr. Co., 53 Fed. Cl. at 622 (citing Day & Zimmermann
Servs., a Div. of Day & Zimmermann, Inc. v. United States, 38 Fed. Cl. 591, 597 (1997)).

Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); see also Matthews v. United States, 72 Fed. Cl. 274, 278 (2006) (stating that subject matter jurisdiction is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case").  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  The court's "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion." Palmer v. United States, 168 F.3d 1310, 1313 (Fed. Cir. 1999).  The parties or the court sua sponte may challenge the court's subject matter jurisdiction at any time. Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).

When considering a motion under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), the burden of establishing the court's subject matter jurisdiction resides with the party seeking to invoke it. McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936); see also Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988) (stating that the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence).  The court "consider[s] the facts alleged in the complaint to be true and correct." Reynolds, 846 F.2d at 747; see also Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995) (recognizing the court's obligation to "assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor"); cf. Betz v. United States, 40 Fed. Cl. 286, 290 (1998) (noting that the court is not required to accept plaintiff's framing of the complaint and that it should "look to plaintiff's factual allegations to ascertain the true nature of the claims").  If the defendant or the court questions jurisdiction, the plaintiff cannot rely solely on allegations in the complaint but must bring forth relevant, adequate proof to establish jurisdiction. See McNutt, 298 U.S. at 189.  In deliberating on a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to decide any factual disputes. See Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999); Reynolds, 846 F.2d at 747.  If the court finds that it lacks subject matter jurisdiction, then it must dismiss the claim. Matthews v. United States, 72 Fed. Cl. 274, 278 (2006); see also RCFC 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

## IV. DISCUSSION

DataMill protests the Army's decision to procure the COLTS program without competition through the use of a delivery order under the Navy Contract, a decision that it asserts violated the CICA.  Compl. ¶¶ 15-16; Pl.'s Resp. Def.'s Mot. Dismiss Lack Jurisdiction Or Alternative, Mot. J. Administrative R. & Supp. Pet. Inj. ("Pl.'s Resp.")[16] 1-2, 7-8, 13; see also

---

[16]  In a separate, concurrently issued decision, the court denied DataMill's motion for expedited discovery and granted defendant's motion to strike the declaration of Mr. Book ("Book Declaration"). See supra note 1.  In so doing, the court also struck those portions of DataMill's response brief that cited to or relied upon statements made in the Book Declaration.

Pl.'s Reply Supp. Mot. Inj. Relief & Mot. J. Administrative R. ("Pl.'s Reply") 6 ("[T]he Government's non-compliance with CICA is not justified and any actions taken by the Government to effectuate its improper procurement decision, whether they are right, wrong, statutorily approved, or not, are irrelevant to DataMill's protest and the application of CICA to the original procurement decision.").  Defendant contends that the FASA divests this court of jurisdiction because DataMill's protest is in connection with the issuance of a delivery order. Def.'s Mot. Dismiss Lack Jurisdiction, Or, Alternative, Mot. J. Administrative R. & Opp'n Pet. Inj. Relief ("Def.'s Mot.") 9.  DataMill, however, asserts that the FASA does not bar its protest because it protests only the Army's decision to procure the COLTS program, not the procurement process occurring thereafter.  Pl.'s Reply 1; see also id. at 2 (arguing that "DataMill's protest challenges only the Government's decision to make a sole-source acquisition, and states no challenge to the issuance of the actual task order (or proposed issuance of said task order . . . . Therefore, the plain language of [the] FASA does not apply" (emphasis added)), 5 ("DataMill protests the decision to make a sole source award.  DataMill does not contest the Army's choice of sole-source contract vehicle." (emphasis added)).

## A.  The Purpose of the FASA

The FASA provides:

(1) A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for–

(A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or

(B) a protest of an order valued in excess of $10,000,000.

(2) Notwithstanding section 3556 of title 31, the Comptroller General of the United States shall have exclusive jurisdiction of a protest authorized under paragraph (1)(B).

(3) This subsection shall be in effect for three years, beginning on the date that is 120 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2008.[17]

---

[17]  Subpart 16.5 of the Federal Acquisition Regulation, which mirrors the FASA prohibition on bid protests, provides:

(i) No protest . . . is authorized in connection with the issuance or proposed issuance of an order under a task-order contract or delivery-order contract, except for–

10 U.S.C. § 2304c(e) (footnote added).  Introduced in the United States Senate in 1993, the FASA was considered to be a "comprehensive overhaul of the federal acquisition laws," S. Rep. No. 103-258, at 3 (1994); see also 140 Cong. Rec. 23885 (1994) (characterizing the FASA as "the most significant procurement reform legislation to be considered by the Senate since the [CICA]"), which were deemed to be "cumbersome" because they "reduce[d] participation," "diminish[ed] competition," and "raise[d] Government procurement costs," 140 Cong. Rec. 23885.  Designed to address the myriad acquisition statutes that, "added together, . . . result [in] a complex and unwieldy system," S. Rep. No. 103-258, at 2, the FASA was intended to

> revise and streamline the acquisition laws of the federal government in order to reduce paperwork burdens, facilitate the acquisition of commercial products, enhance the use of simplified procedures for small purchases, strengthen the industrial base that supports the common defense, and improve the efficiency and effectiveness of the laws governing the manner in which the government obtains goods and services.

S. Rep. No. 103-259, at 1 (1994).  The legislation focused upon "the most critical issue" facing the federal procurement system: "transform[ing] an outmoded system that was designed to regulate defense-dependent industries into a system that will facilitate commercial-military integration and the development of dual-use industries that can meet the defense technology and industrial base requirements for the nineties and beyond."  Id. at 6-7.  In short, Congress enacted the FASA in order to, among other things, (1) make "sweeping reforms to the Federal Procurement System," 140 Cong. Rec. 24865 (1994); (2) provide "accelerated notice of contract awards, contract debriefings, and bid protests," id. at 24870; and (3) "shrink the bureaucracy," id.

As the court in A & D Fire Protection, Inc. noted, "[i]n the interest of efficiency, bid protests were targeted by [the] FASA as one of the areas in need of reform[.]"  72 Fed. Cl. at 133.  The FASA "revise[d] and simplif[ied] the bid protest process with a view towards reducing the number of protests that are filed."  S. Rep. No. 103-259, at 7.  For example, Congress recognized that open competition requirements under the CICA resulted in losing bidders filing protests "as a means to discover the propriety of an award decision.  These protests unnecessarily tax[ed] the already burdened procurement system in a manner which could be obviated simply by requiring the appropriate disclosure of such information in the form of a debriefing."  Id.

---

(A) A protest on the grounds that the order increases the scope, period, or maximum value of the contract; or

(B) A protest of an order valued in excess of $10 million.  Protests of orders in excess of $10 million may only be filed with the [GAO], in accordance with the procedures at 33.104.

48 C.F.R. § 16.505(a)(9)(i).

Additionally, the FASA streamlined procurements involving task or delivery order contracts.[18]  In its report, the Senate Committee on Governmental Affairs ("CGA") noted that "indiscriminate use of task order contracts for broad categories of ill-defined services unnecessarily diminishes competition and results in the waste of taxpayer dollars."  Id. at 15.  The CGA recognized that this "problem can effectively be addressed, without significantly burdening the procurement system, by awarding multiple task order contracts for the same or similar services and providing reasonable consideration to all such contractors in the award of such task orders under such contracts."  Id.  Additionally, the CGA indicated that it "intend[ed] that all federal agencies should move to the use of multiple task order contracts, in lieu of single task order contracts, wherever it is practical to do so."  Id.  The proposed revisions were

> intended to give[] agencies broad discretion in establishing procedures for the evaluation and award of individual task orders under multiple award contracts. They do not establish any specific time frames or procedural requirements for the issuance of task orders, other than that there be a specific statement of work and that all contractors under multiple award contracts be afforded a reasonable opportunity to be considered in the award of each task order (with narrow exceptions).  Accordingly, contracting officials will have wide latitude and will not be constrained by [the] CICA requirements in defining the nature of the procedures that will be used in selecting the contractor to perform a particular task order.  When contracting officials award task orders they will have broad discretion as to the circumstances and ways for considering factors such as past performance, quality of deliverables, cost control, as well as price or cost.

Id. at 16.  By providing "general authorization for the use of task and delivery order contracts to acquire goods and services other than advisory and assistance services," the FASA was

> intended as a codification of existing authority to use such contractual vehicles. All otherwise applicable provisions of law would remain applicable to such acquisitions, except to the extent specifically provided in [10 U.S.C. § 2304a]. For example, the requirements of the [CICA], although they would be inapplicable to the issuance of individual orders under task and delivery order contracts, would continue to apply to the solicitation and award of the contracts themselves.

---

[18]  A "task order contract" is defined as a "contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract."  10 U.S.C. § 2304d(1).  A "delivery order contract" is defined as a "contract for property that does not procure or specify a firm quantity of property (other than a minimum or maximum quantity) and that provides for the issuance of orders for the delivery of property during the period of the contract."  Id. § 2304d(2).

H.R. Rep. No. 103-712, at 178 (1994) (Conf. Rep.).

## B. The Plain Language of the FASA

Statutory analysis begins with the plain language of the act.  McEntee v. Merit Sys. Prot. Bd., 404 F.3d 1320, 1328 (Fed. Cir. 2005); Highmark, Inc. v. United States, 78 Fed. Cl. 146, 148 (2007); accord Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."); Skillo v. United States, 68 Fed. Cl. 734, 744 (2005) ("The canons of statutory interpretation require the court to consider first the plain language of the statute . . . ."). The Supreme Court noted in Connecticut National Bank v. Germain: "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." 503 U.S. 249, 253-54 (1992). Thus, in order to ascertain the plain meaning of a statute, the court must look to the statute's text and structure.  Robinson, 519 U.S. at 341; accord Myore v. Nicholson, 489 F.3d 1207, 1211 (Fed. Cir. 2007).  "If, in a given case, the words of the statute do not provide an answer, then a court has no choice but to fill in the interstices."  VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1579 (Fed. Cir. 1990).  If, on the other hand, the statutory language is clear and unambiguous, then the court's inquiry ends with the plain meaning.[19]  Roberto v. Dep't of the Navy, 440 F.3d 1341, 1350 (Fed. Cir. 2006).

In Global Computer Enterprises, Inc., the court analyzed the plain language of the FASA and determined that the statute "prohibits protests 'in connection with' two events: (1) the issuance of a task or delivery order; or (2) the proposed issuance of a task or delivery order." 88 Fed. Cl. at 410.  Despite the government and the defendant-intervenor's contention in that case that the issuance of a task order modification was "in connection with" the issuance of the task order, the court determined otherwise: "If Congress intended to prohibit protests stemming from any action related to a task order contract, then it could have explicitly drafted a statute that barred any protest in connection with a task order.  It did not do so."  Id. at 414-15.  Because the protester's challenge was not in connection with the issuance or proposed issuance of a task order, the Global Computer Enterprises, Inc. court possessed subject matter jurisdiction over the protest and ultimately reached the merits.[20]

---

[19]   When the court determines that statutory language is clear and unambiguous, it need not seek clarification in the legislative history.  Norfolk Dredging Co. v. United States, 375 F.3d 1106, 1110 (Fed. Cir. 2004).  Indeed, the FASA's legislative history "does not shed meaningful light on the scope of the task order protest bar."  Labat-Anderson, Inc. v. United States, 50 Fed. Cl. 99, 105 (2001).

[20]   Alternatively, the court determined that, even if the FASA bar applied, it possessed subject matter jurisdiction over the protest because the protester's action fell within one of the FASA's statutory exceptions, namely that the task order, as modified, exceeded or increased the period of the underlying contract.  Global Computer Enterprises, Inc., 88 Fed. Cl. at 415-16.

1.  The **Global Computer Enterprises, Inc.** Court Did Not Define the Scope of the Phrase
"In Connection With"

Both parties rely upon Global Computer Enterprises, Inc. in support of their respective
jurisdictional arguments.  Defendant contends that Global Computer Enterprises, Inc. instructs
that the court lacks jurisdiction to entertain protests that are in connection with a delivery order
"unless the protester alleges that the order increases the scope of the underlying contract."  Def.'s
Mot. 7 (citing 88 Fed. Cl. at 410).  DataMill asserts that defendant adopts a broad reading of the
phrase "in connection with," even though the Global Computer Enterprises, Inc. court expressly
declined to do so.  Pl.'s Reply 2 (stating that, notwithstanding defendant's assertion that the
phrase "in connection with" should be broadly construed, "the court has already made a contrary
ruling upon this issue").

Ultimately, the Global Computer Enterprises, Inc. court did not interpret the scope of the
phrase "in connection with" because its analysis of the FASA was limited to determining
whether the issuance, without competition, of task order modifications was encompassed by the
terms "issuance" or "proposed issuance" of a task order.  Its analysis of the FASA's plain
language, therefore, focused upon the terms "modification," "issuance," and "proposed
issuance," not upon the phrase "in connection with":

> [T]he court is not persuaded that a modification to a task order is, as the
> government and QSS contend, "in connection with" either the "issuance" or
> "proposed issuance" of that task order.  With respect to terminology, a
> modification is defined as an "alteration, adjustment, or limitation."  The term
> "issuance" is defined as "[t]he act of issuing," and "issue" is defined as "[t]he act
> of circulating, distributing, or publishing by an office or official group" or
> "[s]omething produced, published, or offered."  The term "propose" means "[t]o
> put forward for consideration, discussion, or adoption; suggest" or "[t]o make
> known as one's intention; purpose or intend."  Certainly a modification to an item
> cannot occur absent the existence of the item itself.  Thus, Modifications 30 and
> 32 cannot exist in a vacuum.  Absent the issuance of the SETS II task order, no
> modifications thereto can occur.  As such, the court cannot conclude that a task
> order modification, which, by definition, must occur subsequent to the circulation,
> publication, or distribution–i.e., issuance–of the task order itself, bears any
> connection with the original issuance that brought the task order into existence.[21]

88 Fed. Cl. at 412 (first alteration & footnote added) (citations omitted); see also id. at 413 ("[A]

---

[21]  The court also noted that neither the government nor the defendant-intervenor could
explain how a task order modification could be "in connection with" the "proposed issuance" of
a task order: "If a modification to a task order cannot occur absent the existence of the task order
itself, then such a modification certainly cannot be 'in connection with' a task order that has not
come into existence."  Global Computer Enterprises, Inc., 88 Fed. Cl. at 410.

modification to a task order cannot exist by itself; the modification must relate to the task order that it modifies.").

The Global Computer Enterprises, Inc. court did briefly address the interpretation of the phrase "in connection with" proffered by the government, which sought a broad construction in the manner similar to the interpretation of the phrase "in connection with" contained in the Tucker Act by the United States Court of Appeals for the Federal Circuit ("Federal Circuit"). The court rejected this position:

> The court disagrees with the government's contention that the term "'in connection with' must be given no less of a 'sweeping scope' in [the] FASA, than in 28 U.S.C. § 1491(b)(1)." The Federal Circuit's interpretations of the phrases "in connection with" and "procurement" in the Tucker Act ultimately offer no guidance concerning the meaning of the phrases "in connection with" and "task order" in the FASA.

Id. at 409 (alteration in original) (citation omitted). Although the FASA and the Tucker Act both contain the term "in connection with," the court explained that it was "faced with two completely different statutes that contain a similar term, rather than multiple iterations of the same term within one statute." Id. at 410. As such, the court "decline[d] . . . to utilize the Federal Circuit's interpretation of the phrase 'in connection with' contained in the Tucker Act to broadly construe the phrase 'in connection with' contained in the FASA as barring a protest that has any connection with a task order." Id. DataMill's contention that the Global Computer Enterprises, Inc. court wholly rejected a broad meaning of the phrase "in connection with," therefore, is inaccurate. The court, without deciding the scope of the phrase, merely refused to justify a broad interpretation of "in connection with" based upon the Federal Circuit's analysis of the Tucker Act in RAMCOR Services Group, Inc. v. United States, 185 F.3d 1286 (Fed. Cir. 1999). See Global Computer Enterprises, Inc., 88 Fed. Cl. at 406-10.

## 2. DataMill's Characterization of Its Protest Ignores the FASA Phrases "In Connection With" and "Proposed Issuance"

Although DataMill characterizes its protest as one challenging "the decision of the C-RAM Program Office to contract for the COLTS software . . . without competition" rather than the Army's decision to utilize a sole-source procurement contract to obtain the goods and services it requires,[22] Compl. ¶ 15 (emphasis added), defendant asserts that DataMill is merely

---

[22] DataMill's briefs suggest that the Army's decision to conduct a noncompetitive sole-source procurement is unrelated to the delivery order at issue in this case. See, e.g., Pl.'s Resp. 13 (inviting the court to "view[] that the Plaintiff has protested the Sole Source Selection and not the Task Order" (emphasis added)); Pl.'s Reply 5 (challenging "the decision to make a sole source award" and arguing that "DataMill does not contest the Army's choice of sole-source contract vehicle" (emphasis added); see also Pl.'s Reply Def.'s Resp. Opp'n Mot. Expedited

framing its protest in a manner that ignores the FASA phrase "in connection with" in order to sidestep the obvious jurisdictional bar by characterizing its protest "as a challenge to the Army's <u>decision</u> to acquire COLTS through a delivery order rather than through competition," Def.'s Opp'n Pl.'s Mot. J. Administrative R. & Reply Supp. Def.'s Mot. ("Def.'s Opp'n") 3-4; <u>see also</u> <u>id.</u> at 4 (arguing that DataMill's position "ignores the language of the FASA, which precludes protests not only of the issuance of a delivery order, but also of protests 'in connection with' the issuance of a delivery order" (quoting 10 U.S.C. § 2304c(e)(1))).  Specifically, defendant explains,

> [t]he Army's "decision" to make a procurement not through competition but through a delivery order is "in connection with" the issuance of that order; the decision is not an act that came after the issuance of the order, or had some tangential relationship to it, but, rather, as the cause of the issuance, is an act that had an immediate and direct connection to it.

<u>Id.</u> at 4.  According to defendant, there is a "direct connection between the decision and the issuance.  It's hard to imagine what . . . kind of action would not be in connection with the issuance of a task order if not the decision that led to the issuance."  Oral Argument 2:38:33-49.

"It is the duty of the court to give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed."  <u>Inhabitants of Montclair, County of Essex v. Ramsdell</u>, 107 U.S. 147, 152 (1883).  As previously noted, the FASA prohibits protests "in connection with" two events: (1) issuance of a task or delivery order; and (2) proposed issuance of a task or delivery order.  10 U.S.C. § 2304c(e)(1); <u>Global Computer Enterprises, Inc.</u>, 88 Fed. Cl. at 410.  Despite DataMill's efforts to characterize its protest as one that falls outside the boundaries of the FASA, its reading of the statute is contrary to the FASA's plain language on two accounts.  First, DataMill essentially redacts the phase "in connection with" from the statute.  Second, DataMill fails to explain how its interpretation can be reconciled with the phrase "proposed issuance" of a delivery order.

### a.  DataMill's Interpretation of the FASA Ignores the Phrase "In Connection With"

The FASA's reach is not restricted to protests that concern the "issuance" or "proposed issuance" of a delivery order.  If Congress intended to bar protests involving the actual "issuance" or "proposed issuance" of a delivery order, then it could have drafted the FASA accordingly.  It did not.  Instead, Congress included in the statute the phrase "in connection with," which modifies the terms "issuance" and "proposed issuance," and defined the specific types of protests that are unauthorized under the FASA.

---

Disc. 1 ("DataMill's claim does not protest . . . the purely legal issue of the propriety of the Army's contract vehicle, but rather presents a <u>protest of the underlying agency decision</u> to make a sole source procurement." (emphasis added)).

Turning to the phrase "in connection with," the court notes that "in" means "[w]ith the aim or purpose of." American Heritage Dictionary 698 (4th ed. 2004). A "connection" is defined as "[t]he condition of being related to something else by a bond of interdependence, causality, logical sequence, coherence, or the like; relation between things one of which is bound up with, or involved in, another." Oxford English Dictionary 747 (2d ed. 1989); see also American Heritage Dictionary, supra, at 303 (defining "connection" as "[a]n association or relationship"). The word "with" means "[i]n relationship to." American Heritage Dictionary, supra, at 1574. Taken together, the phrase "in connection with" references something designed to possess a logical or sequential relationship to or be bound up with or directly involved in something else. In other words, the phrase "in connection with" means that there is a direct and causal relationship between two things that are mutually dependent. It is therefore apparent that the phrase "in connection with" encompasses those occurrences that have a direct and causal relationship to the "issuance" or "proposed issuance" of a delivery order.

An agency's underlying decision to procure goods or services without competition through a delivery order has a direct and causal relationship to the "issuance" or "proposed issuance" of the delivery order that agency ultimately utilizes to effectuate the procurement. Neither the "issuance" nor "proposed issuance" of a delivery order can exist in a vacuum. See Global Computer Enterprises, Inc., 88 Fed. Cl. at 412 (recognizing that modifications to a task order "cannot exist in a vacuum" but are instead dependent upon the existence of the task order to which the modifications are directed). An agency's procurement process involves several phases, including the (1) identification of a procurement need, (2) decision to acquire the need, and (3) development of an acquisition plan through which to acquire goods or services that will satisfy the need. The process is sequential, with the agency's fundamental, underlying decision to proceed forward with an acquisition having a direct connection to the occurrences that follow. In the absence of this decision to acquire a specific need, a procurement simply cannot take place. All subsequent procurement actions flow directly from the agency's decision to procure goods or services in the first instance.

DataMill, in attempting to disengage the Army's decision to acquire goods or services through a noncompetitive procurement mechanism from the ultimate issuance of that mechanism, see Oral Argument 3:11:09-13:15 (arguing that the Army's decision to engage in a sole-source procurement is separate and distinct from the Army's decision to use any particular contract vehicle), ignores the logical, causal relationship between the two events. The procurement process is not bifurcated in this manner. Indeed, an agency's determination that it requires property or services is statutorily deemed part of a procurement. See 41 U.S.C. § 403(2) (defining the term "procurement" to "include[] all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout"[23] (emphasis added)). Thus, if such a determination

---

[23] The meaning of the term "procurement," for purposes of title 10 of the United States Code, is the same as the meaning provided in section 4 of the Office of Federal Procurement Policy Act, 41 U.S.C. § 403(2). 10 U.S.C. § 2302(3)(A); see also Res. Conservation Group, LLC

constitutes a procurement, then a subsequent decision to acquire the property or services by use of a specific contracting mechanism is also part of that process.  Absent the decision to acquire the COLTS program without competition by means of a delivery order issued under the Navy Contract, the Army simply could not have proceeded forward with an acquisition that resulted in the "issuance" of a delivery order.  The underlying decision, therefore, has a direct and causal relationship to the "issuance" of the delivery order that the Army utilized to obtain the COLTS program–what DataMill terms the "execution" of that decision, <u>see</u> Pl.'s Reply 1.  The Army's decision to procure the COLTS program noncompetitively through use a delivery order is, by its very nature, "in connection with" the "issuance" of that delivery order.

### b.  DataMill's Proffered Interpretation Does Not Give Meaning to the FASA Phrase "Proposed Issuance"

In Part IV.B.2.a, <u>supra</u>, the court rejected DataMill's interpretation of the FASA–that an agency's procurement decision to use a delivery order is not "in connection with" the "issuance" of a delivery order–because such a decision is entirely related to ("in connection with") the ultimate existence ("issuance") of the delivery order itself.  The court must also reject DataMill's interpretation for a second reason: DataMill only contemplates protests involving the actual issuance of a delivery order.  The FASA bars protests that are "in connection with" both the "issuance" and "proposed issuance" of a delivery order.  The court must interpret the FASA in a manner that gives effect to each term, including "proposed issuance."  However, DataMill does not explain how its interpretation applies in situations where a delivery order has not yet issued.  Indeed, DataMill's interpretation of the FASA bar is wholly unsustainable when applied to protests involving the "proposed issuance" of a delivery order.

As a preliminary matter, the "proposed issuance" of a delivery order always precedes its actual "issuance."  <u>See</u> <u>Global Computer Enters., Inc.</u>, 88 Fed. Cl. at 412 (observing that the term "propose" means "'[t]o <u>put forward for consideration</u>, discussion, or adoption; suggest'" or "'[t]o make known as one's intention; purpose or intend'" (quoting <u>American Heritage Dictionary</u>, <u>supra</u>, at 1118) (emphasis added)).  The "proposed issuance" of a delivery order means that "issuance" has not yet occurred, and the mere fact that an agency has decided upon a noncompetitive procurement via delivery order does not mean that the procurement will ultimately result in the "issuance" of a delivery order.  Nevertheless, the "issuance" of a delivery order must always follow its "proposed issuance," and, a fortiori, those events that are "in connection with" the "issuance" of a delivery order must also be "in connection with" the "proposed issuance" of a delivery order.

---

<u>v. United States</u>, No. 2009-5091, 2010 WL 681363, at *4 (Fed. Cir. Mar. 1, 2010) (noting that section 403 "related to the establishment of the Office of Federal Procurement Policy, an office within the Office of Management and Budget that plays a central role in shaping the policies and practices federal agencies use to acquire goods and services").

Under DataMill's interpretation of the FASA, a protest of an agency's decision to conduct a noncompetitive procurement through a delivery order must also not be "in connection with" the "proposed issuance" of a delivery order. Such a conclusion, however, is without foundation or merit. In the absence of the actual "issuance" of a delivery order, the only challenge a protester could bring that involves the "proposed issuance" of a delivery order would implicate those occurrences that predate and are designed to culminate in the "issuance" of the order. A protest involving the "proposed issuance" of a delivery order cannot challenge the delivery order itself because it does not exist–there is no "execution" of the agency's sole-source procurement decision.

Absent the "issuance" of a delivery order, a protest involving the "proposed issuance" of a delivery order necessarily implicates the agency's decision to conduct a procurement via a delivery order. All actions that predate the "issuance" of the delivery order are "in connection with" the "proposed issuance" thereof and are directly and causally related to the initial decision to conduct the procurement. Indeed, without the actual "issuance" of the delivery order, it is difficult to imagine what a protester could challenge in the "proposed issuance" situation other than the decision itself and related, subsequent conduct during the agency's procurement process that was intended to result in a delivery order that has yet to exist. Accordingly, the Army's decision to conduct a noncompetitive sole-source procurement via a delivery order must be "in connection with" the "proposed issuance" of a delivery order.

In sum, DataMill's argument that its protest falls outside the FASA bar wholly ignores the "proposed issuance" language contained in the statute. The court cannot adopt an interpretation that gives effect to or can be harmonized with only part of a statute. Indeed, it is inconceivable that an agency's decision to conduct a noncompetitive sole-source procurement via a delivery order is barred by the FASA because it is "in connection with" the "proposed issuance" of a delivery order but is not barred by the FASA because it is not "in connection with" the actual "issuance" of a delivery order. Although DataMill places importance upon the "issuance" of a delivery order in an effort to distinguish between the "decision" and the "execution" of the decision, Pl.'s Reply 1, the existence of an actual delivery order is ultimately irrelevant. The FASA bar encompasses protests that are "in connection with" delivery orders that have either been issued or have not yet issued. Because the FASA implicates protests that are "in connection with" both the "issuance" and "proposed issuance" of delivery orders, it prohibits a protest of an agency's decision to conduct a noncompetitive procurement via a delivery order without regard to the final disposition of the delivery order itself.

## C. DataMill Has Cited No Case Law That Supports Its Proffered Interpretation of the FASA

As explained in Part IV.B.2, supra, DataMill's attempt to separate an agency's decision to conduct a noncompetitive, sole-source procurement via delivery order from the "issuance" or "proposed issuance" of the delivery order finds no support in the FASA. It also finds no support in the three cases upon which DataMill relies: Global Computer Enterprises, Inc.; Distributed

<u>Solutions, Inc. v. United States</u>, 539 F.3d 1340 (Fed. Cir. 2008), <u>rev'g</u> 76 Fed. Cl. 524 (2007); and <u>Savantage Financial Services, Inc.</u>  The court addresses these cases in turn below.

The protest in <u>Global Computer Enterprises, Inc.</u> is wholly distinguishable from DataMill's protest.  First, the court possessed jurisdiction because the protester challenged modifications to a task order, not the issuance or proposed issuance of the task order itself.  88 Fed. Cl. at 410-415.  Alternatively, the <u>Global Computer Enterprises, Inc.</u> court determined that, even if the protest was "in connection with" the "issuance" or "proposed issuance" of a task order, the FASA bar did not apply because the protest implicated one of the FASA's enumerated exceptions.  <u>See</u> <u>supra</u> note 20.  Thus, DataMill misreads the decision when it claims that <u>Global Computer Enterprises, Inc.</u> was "not based upon the existence of a task order or delivery order or application of a FASA exception."  Pl.'s Reply 3.  By contrast, DataMill's protest directly implicates a delivery order, not a delivery order modification.  <u>See</u> Compl. ¶ 4 (alleging that the Army "effectuated this non-competitive decision by awarding Avantix the Task Order . . . .  No sole source justification was approved for this no-competition procurement").  Unlike the <u>Global Computer Enterprises, Inc.</u> protester, DataMill does not contend that one of the FASA exceptions applies in this case because it never alleges that the delivery order procuring the COLTS program exceeded the scope, value, or period of the Navy Contract.  On this basis alone, DataMill's protest falls outside the <u>Global Computer Enterprises, Inc.</u> parameters.

Moreover, DataMill's reliance upon <u>Global Computer Enterprises, Inc.</u> for the proposition that the court can set aside a procuring agency's contract if the procurement official's decision lacked a rational basis, <u>see</u> Pl.'s Reply 3 ("Further, in <u>Global Computer Enterprises[,]</u> <u>Inc.</u>, this court directly stated that it has jurisdiction to set aside a procuring agency's contract 'if either: <u>(1) the procurement official's decision lacked a rational basis</u>; or (2) the procurement procedure involved a violation of regulation or procedure." (citation omitted)), ignores the critical distinction between jurisdictional and merits determinations.  Once jurisdiction is established, the court, pursuant to the ADRA, utilizes the standards set forth in the APA to review agency action.  <u>See</u> <u>supra</u> Part III.A; <u>accord</u> <u>Global Computer Enterprises, Inc.</u>, 88 Fed. Cl. at 399.  The <u>Global Computer Enterprises, Inc.</u> court's discussion of its standard of review in bid protests does not support a conclusion that the court possesses jurisdiction merely "because DataMill challenges only the sole source procurement decision."  Pl.'s Reply 3.

Next, DataMill cites the Federal Circuit's decision in <u>Distributed Solutions, Inc.</u> for the proposition that the court is "vested with appropriate jurisdiction over the protest of the Government's pre-procurement decisions, regardless of the fact that no procurement was ever made."  <u>Id.</u>  In <u>Distributed Solutions, Inc.</u>, the United States Agency for International Development ("USAID") issued a task order to SRA International, Inc. ("SRA") for information technology support and technical services.  76 Fed. Cl. at 525.  USAID, in conjunction with SRA, developed and issued a Request for Information ("RFI") that solicited vendor responses "'for market research purposes only.'"  <u>Id.</u> (quoting the administrative record).  Thereafter, USAID announced that it had "'decided to pursue alternative courses of action,'" <u>id.</u> (quoting the administrative record), and SRA issued a second RFI seeking vendors who might serve as

subcontractors.  Id. at 526; see also 539 F.3d at 1343 (noting that "SRA, with approval from the government, selected and awarded subcontracts to vendors providing the necessary software").  The protesters, who responded to SRA's second RFI but were ultimately not awarded subcontracts, 76 Fed. Cl. at 526-27, initiated a protest before the GAO; however, the GAO dismissed the protest because a "Federal agency procurement [was] not at issue in this matter," id. at 528.  The Court of Federal Claims reached the same result, determining that the Tucker Act "provides procurement protest jurisdiction to this court over procurements by Federal agencies, [and] disappointed subcontractors are not afforded protest rights."  Id. (citing Blue Water Envtl., Inc. v. United States, 60 Fed. Cl. 48 (2004)).

The Federal Circuit reversed.  539 F.3d at 1346.  The protesters, it indicated, were "not contesting SRA's award of the subcontracts.  Rather, they [we]re contesting the government's decision to task SRA with awarding subcontracts . . . instead of procuring the software itself through a direct competitive process."  Id. at 1343-44 (emphasis added); see also id. at 1344 (noting that the contractors "challeng[ed] the government's decision to 'pursue an alternative course of action' by inserting SRA into the process instead of directly procuring from the process'").  The Federal Circuit then addressed the jurisdictional issue, noting that the Tucker Act encompassed both actual procurements and proposed procurements.  Id. at 1346.  Recognizing the broad and "'sweeping'" scope of the Tucker Act phrase "in connection with," id. at 1345 (quoting RAMCOR Servs. Group, Inc., 185 F.3d at 1289), the Federal Circuit explained:

> [T]he phrase, "in connection with a procurement or proposed procurement," by definition involves a connection with any stage of the federal contracting acquisition process, including "the process for determining a need for property or services."  To establish jurisdiction pursuant to this definition, the contractors must demonstrate that the government at least initiated a procurement, or initiated "the process for determining a need" for acquisition . . . .

Id. at 1346.  The government, the Federal Circuit explained, "decided not to procure software itself from the vendors, but rather to add that work to its existing contract with SRA," and such a pre-procurement decision was encompassed by the "proposed procurements" language contained in the Tucker Act because "[a] proposed procurement, like a procurement, begins with the process for determining a need for property or services."  Id.

The Federal Circuit's reasoning in Distributed Solutions, Inc. confirms that jurisdiction over DataMill's protest is foreclosed by the FASA.  Although DataMill contends that there is a substantive distinction between a "procurement decision" and the "execution of that decision," Pl.'s Reply 1, the Distributed Solutions, Inc. court did not distinguish between the government's pre-'procurement decision'–use of an RFI to solicit information that was then used to determine its requirements–and the eventual 'execution of that decision'–the government's decision to add

work to an existing contract with SRA and to task SRA with issuing subcontracts.[24]  See 539 F.3d at 1346.  Rather, the Federal Circuit suggested that the procurement process is part of a continuum that commences with the determination of a need for property or services.  Id.  That process, it concluded in Distributed Solutions, Inc., was "in connection with" the proposed procurement at issue for purposes of the Tucker Act.  Id.

In this case, the Army's decision to obtain the COLTS program through a noncompetitive sole-source, delivery order procurement was "in connection with" the ultimate product of that procurement: issuance of a delivery order for the COLTS program.  The Army's noncompetitive sole-source procurement commenced with that underlying decision, and each subsequent action in furtherance thereof was part of the same procurement process.  DataMill has proffered no explanation as to how Distributed Solutions, Inc. suggests otherwise and supports its position that the "execution" of a procurement decision is somehow separate from the decision itself.

Of course, Distributed Solutions, Inc. is factually distinguishable because that protest did not involve the "issuance" or "proposed issuance" of a task or delivery order.  As the Federal Circuit explained, "[t]he only issue is whether the contractors' protest is 'in connection with a procurement or a proposed procurement' under the scope of § 1491(b)."  Id. at 1345.  The FASA bar was neither implicated nor discussed.  While DataMill asserts that Distributed Solutions, Inc. "stands for the proposition that regardless of the existence of a task order, this court has jurisdiction to entertain protests of pre-procurement decisions," Pl.'s Reply 3, this characterization is entirely misleading.  The Tucker Act's jurisdictional grant is limited by the FASA.  Although the FASA is not always implicated in every case, as was the situation in Distributed Solutions, Inc., DataMill asks the court to ignore the FASA entirely.  According to DataMill, the Court of Federal Claims possesses jurisdiction over all protests of pre-procurement decisions without regard to the existence of task or delivery orders.  In light of the FASA, this statement is simply false.

Finally, DataMill contends that Savantage Financial Services, Inc. lends support for its position that an agency's noncompetitive sole-source procurement decision is separate and distinct from the execution of that decision.  Id. at 4.  In Savantage Financial Services, Inc., the Department of Homeland Security ("DHS") sought to consolidate its financial systems application software by "'migrating' DHS components to a shared software baseline" in the Transformation and Systems Consolidation ("TASC") initiative.  81 Fed. Cl. at 302.  In July 2007, a DHS contracting officer executed a "Brand Name Justification" document selecting the Oracle and SAP financial management systems as the baseline for the TASC initiative.  Id.  The DHS did not conduct a competition for the selection of these two systems, and the "Brand Name Justification" document was not made available for public inspection.  Id. at 303.

---

[24]  The Court of Federal Claims, in Savantage Financial Services, Inc., discussed infra, also did not distinguish between a procurement and a decision to make a procurement, instead concluding in that case that a decision to select financial management systems without competition constituted a procurement itself and violated the CICA.  81 Fed. Cl. at 303-05.

On August 22, 2007, approximately one month after the issuance of the "Brand Name Justification" document, the DHS issued a solicitation "for services to manage the migration process to the Oracle and SAP systems" under the Enterprise Acquisition Gateway for Leading-Edge Solution ("EAGLE") contracting vehicle.  Id.  The solicitation was ultimately canceled because no offerors submitted proposals.  Id.  On November 20, 2007, the DHS issued a TASC solicitation as a task order request under the EAGLE contract.  Id.  The purpose of this solicitation was identical to the August 22, 2007 solicitation: to migrate the DHS's financial management software systems to the Oracle and SAP systems.  Id.  Following the issuance of the November 20, 2007 TASC solicitation, the protester filed suit, contending that "the underlying decision to use Oracle and SAP systems as the TASC baseline should have been made through competition."  Id.; see also id. (requesting declaratory relief prohibiting the DHS "from proceeding with the TASC solicitation or any related solicitation or task order without first complying with applicable statutory and regulatory requirements in its selection of a financial systems application software migration candidate for its TASC initiative" (emphasis added)).

The Savantage Financial Services, Inc. court's jurisdictional analysis focused upon whether the DHS's decision to migrate to the Oracle and SAP systems constituted a procurement. Id. at 304.  Determining that this decision was a procurement, the court noted that "[a] mere determination that such property or services are needed constitutes part of the procurement process."  Id. at 305 (citing 41 U.S.C. § 403(2)).  It emphasized that the DHS's issuance of the TASC solicitation "for services to support the transition to Oracle and SAP indicates that such a determination was made."  Id.  Accordingly, the court found that the agency's "decision to utilize the Oracle and SAP financial systems application software as its baseline for the TASC initiative constitutes a procurement, and properly invokes the jurisdiction of this Court."  Id.

Next, the Savantage Financial Services, Inc. court focused upon whether the challenged sole-source procurement–, i.e., the decision to use the Oracle and SAP systems via the "Brand Name Justification" document–was improper and violated the CICA.  Id. at 306-07.  Addressing the government's argument that no CICA violation occurred because the TASC solicitation was a task order request issued under the EAGLE contract in compliance with the FASA, the court determined that the protester had not challenged the TASC task order solicitation.  Id. at 308.  It stated:

> Defendant is correct that the TASC solicitation is identified as a task order issued under DHS's EAGLE contract.  If plaintiff were challenging the TASC solicitation, this Court would indeed lack jurisdiction under [the] FASA.  Nevertheless, plaintiff is not challenging the TASC solicitation.  Plaintiff is challenging DHS's decision to use Oracle and SAP software systems as the baseline for its TASC initiative.  Defendant's arguments regarding the TASC solicitation are therefore irrelevant.

Id. (emphasis added).  Thus, because the protester challenged a procurement decision that was not made through a task or delivery order procurement, the Savantage Financial Services, Inc.

court concluded that the FASA bar had no application.  Id.

DataMill misconstrues the court's decision in Savantage Financial Services, Inc., virtually ignoring the fact that the protest in that case involved the DHS's underlying decision to use the Oracle and SAP systems, a noncompetitive decision that the court held was a procurement.  That procurement, which occurred approximately four months prior to the TASC task order solicitation, see id. at 303, ultimately bore no relation to the "issuance" or "proposed issuance" of the TASC task order, see id. at 303, 305-06, 308.  Since the protester challenged a noncompetitive procurement decision that was not "in connection" with the "issuance" or "proposed issuance" of the TASC task order, see id. at 308 (stating that the protester "is not challenging the TASC solicitation"), and did not challenge any noncompetitive decision to award work under the TASC task order, the FASA was not implicated.  The Savantage Financial Services, Inc. court recognized, however, that it "would indeed lack jurisdiction under FASA" if the protester challengeed the decision to engage in a noncompetitive task order procurement."  Id.  The very situation that the Savantage Financial Services, Inc. court acknowledged would divest it of jurisdiction, viz., a protest challenging the decision to engage in a noncompetitive task order procurement, is at issue here.  Nothing in Savantage Financial Services, Inc. supports DataMill's argument that the FASA bar of protests that are "in connection with" the "issuance" of a delivery order does not apply in this case.

### D. DataMill's Protest Is "In Connection With" the "Issuance" of a Delivery Order

DataMill's protest falls directly within the FASA bar.  Its challenge to the Army's decision to conduct a noncompetitive sole-source procurement via a delivery order is, by its very nature, directly related to and bound up with the delivery order utilized by the Army to obtain the COLTS program.  In FASA terms, the Army's decision is "in connection with" the "issuance" of a delivery order.  DataMill's contention that the decision to conduct a noncompetitive sole-source procurement is somehow separate and distinct from the subsequent procurement process that leads to the issuance of a delivery order finds no support in the FASA or in the case law DataMill cites.

Because DataMill has not alleged that the delivery order in this case exceeded the scope, period, or maximum value of the Navy Contract, its protest is barred by the FASA.  The court, therefore, lacks subject matter jurisdiction over its protest and grants defendant's motion to dismiss.  In light of its jurisdictional holding, the court does not reach the merits of DataMill's protest and denies as moot its petition for preliminary and permanent injunctive relief, and motion for judgment upon the administrative record.

### V.  CONCLUSION

For the reasons discussed above, it is hereby ordered:

1.  Defendant's motion to dismiss for lack of subject matter jurisdiction is

**GRANTED**.  The Clerk of Court is directed to enter judgment dismissing without prejudice DataMill's complaint.

2.  DataMill's petition for preliminary and permanent injunctive relief is **DENIED AS MOOT**.

3.  DataMill's motion for judgment upon the administrative record is **DENIED AS MOOT**.

No costs.

The court has filed this decision under seal.  The parties shall confer to determine proposed redactions that are mutually agreeable.  Then, by no later than **Friday, March 19, 2010**, the parties shall file under seal a joint status report indicating their agreement with the proposed redactions and attaching a complete copy of the court's opinion with all redactions clearly indicated.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge